## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

RENEE MARO,                                          CASE NO.:

    Plaintiff

**v.**                                              **PLAINTIFF DEMANDS
                                                    A TRIAL BY JURY**

PRIMARY CARE PHYSICIANS OF
HOLLYWOOD, P.L., and WOUND CARE
MANAGEMENT SPECIALISTS, LLC,

    Defendants.
_____/

## COMPLAINT

Plaintiff, Renee Maro, by and through her counsel, Derek Smith Law Group, PLLC, hereby complains of the Defendants Primary Care Physicians of Hollywood, P.L., and Wound Care Management Specialists, LLC, and alleges as follows:

## NATURE OF CASE

1. This is an action for damages and other relief pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*, as amended ("Title VII"); and the Florida Civil Rights Act of 1992, Section 760.10 *et seq.* ("FCRA"), and seeks damages to redress the injuries Plaintiff has suffered as a result of being discriminated against, sex/gender discrimination, sexually harassed, hostile work environment and retaliated against by her employer for opposing the ongoing sexual behavior.

## JURISDICTION AND VENUE

2. This is an action for monetary damages and all other appropriate relief as deemed by the court, pursuant to Title VII of the Civil Rights Act of 1964 and FCRA.

3. This Court has jurisdiction of the claims herein pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding deprivation of Plaintiff's civil rights under Title VII of the Civil Rights Act of 1964 and FCRA.

4. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) based upon the fact Defendants were located in this judicial district, and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein occurred in this district. Plaintiff was employed by Defendant within Florida in Broward County. Additionally, the events took place in Broward County.

5. On or about October 4, 2018, Plaintiff dual-filed charges with the EEOC and FCHR against Defendants as set forth herein.

6. On or about September 12, 2019, the EEOC issued Plaintiff a Right to Sue Letter.

7. This action is being commenced within ninety (90) days of receipt of the EEOC Right to Sue Letter.

## PARTIES

8.  At all material times, Plaintiff RENEE MARO (hereinafter referred to as "Plaintiff" or "MARO") is an individual female who is a resident of the State of Florida and resides the Broward County.

9. Defendant PRIMARY CARE PHYSICIANS OF HOLLYWOOD, P.L. (hereinafter referred to as "PCP") was and still is, a Florida Limited Liability Company authorized to do business in the State of Florida.

10. Defendant WOUND CARE MANAGEMENT SPECIALISTS, LLC (hereinafter referred to as "WCM") was, and still is, a Florida Limited liability Company authorized to do business in the State of Florida.

11. At all times material, Defendant PCP and Defendant WCM (collectively herein referred to as "Company") were Plaintiff's joint and/or sole employer.

12. Defendant Company is owned by Dr. Moises Issa, an individual man.

13. At all material times, Dr. Issa was Plaintiff's direct supervisor, controlling all tangible aspects of Plaintiff's job duties, and holding the power to hire and fire Plaintiff.

14. Defendant Company is an employer as defined by all laws under which this action is brought and employs the requisite number of employees.

**STATEMENT OF FACTS**

15. On or around October 31, 2017, Defendant Company hired Plaintiff as the "Director of Sales and Marketing."

16. At all times material, Defendant Company and Plaintiff agreed as follows: begin a 90-day training period at $7,000/month followed by a salary increase to $10,000/month scheduled to take place on 2/1/18.  Further, Defendants were to provide Plaintiff a commission of 10% on each patient amount brought in.  Further, Defendant Company further advised Plaintiff that her cell phone, car expenses, and all company related expenses would be covered and paid by Defendant.  Lastly, Defendant promised Plaintiff four (4) weeks paid vacation per year.

17. On or about January 22, 2018, Dr. Issa offered Plaintiff and additional $100/patient that switched from a COPD drug to a generic inhaler where Plaintiff would also receive monthly residual commissions.

18. On or around February 2, 2018, Plaintiff asked Dr. Issa when she could expect the salary change to take place to no avail.

19.  Despite her requests, Defendant Company failed to provide Plaintiff with her increased salary.

20. On or around March of 2018, Dr. Issa explained to Plaintiff that he wanted her to handle more responsibilities. Dr. Issa insisted that he wanted to terminate an employee in marketing, K.N., and have Plaintiff assume the marketing responsibilities for PCP in addition to her then preexisting responsibilities.

21. On or around March 23, 2018, Dr. Issa took Plaintiff to a corporate event at Eleven Nightclub. While at the event, Dr. Issa cornered Plaintiff and attempted to kiss Plaintiff.  Without prompting and against the wishes of Plaintiff, Dr. Issa forcibly grabbed Plaintiff's face and refused to let go.

22. On a regular and frequent basis throughout the course of her employment, Dr. Issa informed Plaintiff that he was separated and that his divorce was proceeding.

23. After consistent "reminders" and feeling pressured, Plaintiff entered into a "romantic" relationship with Dr. Issa in or around the end of March 2018.

24. At all times material, Dr. Issa instructed Plaintiff that he did not want it to be known that they were "seeing each other" as it would have implications on his divorce.

25. On or around March 31, 2018, Dr. Issa asked Plaintiff to permanently take on the marketing responsibilities with PCP. Plaintiff agree and insisted that she needed additional training, to which Dr. Issa agreed.

26. At all times material, subsequent to agreeing to enter in a "relationship," Defendant Company increased Plaintiff's salary $10,000/month, as previously promised.

27. At all times material, Dr. Issa began providing Plaintiff with lavish and expensive gifts, including offering to pay for extensive repairs to Plaintiff's condominium.

28. On or around June 24, 2018, Dr. Issa asked Plaintiff to join him on vacation to Israel over July 4, 2018. Plaintiff reluctantly agreed.

29. At all material times, Dr. Issa took care of booking the trip, insisting that he would tell the staff that they both "happened" to have off at the same time. Dr. Issa was adamant that no other employee know that Plaintiff was joining him on his vacation.

30. During the trip in Israel, Plaintiff and Dr. Issa get into an argument. Upon the trip's end, Plaintiff informed Dr. Issa that she was not interested in continuing any personal relationship with Dr. Issa and insisted that their "romantic" relationship end immediately.

31. Dr. Issa became incensed at Plaintiff ending their relationship and began to retaliate against Plaintiff at work.

32. On or around July 24, 2018, Plaintiff asked Dr. Issa for permission to use her vacation time from September 13, 2018 through September 19, 2018 to visit her aunt who going through treatment for Stage 4 Lung Cancer.  Dr. Issa reluctantly approved a portion of Plaintiff's request, demanding she be back by September 17, 2018 to attend a Humana Benefits dinner with him.

33. On July 24, 2018, Plaintiff reluctantly joined Dr. Issa for dinner on his birthday.  During dinner, Plaintiff and Dr. Issa spoke about his interest in acquiring dozens of existing medical practices. Dr. Issa insisted that he would give Plaintiff a fee for helping negotiate the acquisitions of these new medical practices, promising that he would take care of Plaintiff and teach her how to negotiate.  Furthermore, Dr. Issa told Plaintiff that he would give her stock in the new company upon completion of the acquisitions, explaining that the mergers could result in a valuation of over $400 million.

34. After dinner, Dr. Issa again attempted to engage Plaintiff in a physical relationship, cornering her and trying to kiss her against her wishes. Plaintiff pleaded with Dr. Issa, exclaiming she was uninterested and shouting "NO," but he persisted.  Plaintiff repeatedly told him she just

wanted to remain professional. Angered by her response, Dr. Issa hastily left Plaintiff alone in the car.

35. Dr. Issa began to ignore Plaintiff, instead choosing to actively make unreasonable demand on Plaintiff through her co-workers rather than contact her directly.

36. On or around August 2, 2018, Defendant's Chief Operations Officer, Audra Harding (hereinafter referred to as "Ms. Harding"), contacted Plaintiff to schedule a meeting for September 13, 2018, expressly at Dr. Issa's request.  Plaintiff told Ms. Harding that by Dr. Issa has approved her vacation and, as a result, she would not be able to make the meeting. Regardless, Ms. Harding preceded to reprimand Plaintiff.

37. On or around August 10, 2018, Ms. Harding again contact Plaintiff, angered and insisting that the Defendant's website was incorrect, demanding that Plaintiff make changes to the website. Plaintiff immediately addressed and revised the website per Ms. Harding's instructions.

38. Plaintiff had no alternative choice but to go through third parties to ensure she got answers and guidance in relation to her daily office tasks/assignments.

39. Prior to turning down Dr. Issa's propositions and advances, Defendant Issa assured Plaintiff that she could contact him regarding any questions she had relating to work.

40. On or around August 16, 2018, Plaintiff joined Dr. Issa and her colleagues for dinner. Following dinner, Dr. Issa called Plaintiff on her personal phone. Plaintiff let the call go to voicemail as she was already on the phone. Once her prior call ended, Plaintiff immediately called Dr. Issa back. Upon him answering, Dr. Issa demanded to know who she did not answer, insisting he was angered by her not answering his call immediately. Dr. Issa berated Plaintiff, asserting he did not have time to teach her how to do open enrollment and that she should "figure it out on [her] own."

41. Stunned, Plaintiff asked Dr. Issa what changed, explaining that this was not their original agreement and that he knew she had no experience in this field and needed his guidance. As Plaintiff spoke, Dr. Issa unceremoniously and abruptly hung up the phone, ignoring Plaintiff.

42. On or around August 20, 2018, Dr. Issa sent Plaintiff a text message saying that there was an "error" with the company van.

43. On or around August 22, 2018, after Plaintiff researched the above issue, and determined a quick solution to the problem, Plaintiff contacted Dr. Issa and apprised him of the solution. When Plaintiff insisted, she would "handle" the matter immediately, Dr. Issa was appreciative and expressed no further concerns.

44. On or around August 28, 2018, Dr. Issa asked to meet Plaintiff the following day to discuss marketing strategy.  After some communication back and forth regarding date/time, Plaintiff and Dr. Issa agreed to meet that Friday, August 31, 2018.  Shortly thereafter, Dr. Issa once again changes his mind and proceeds to reschedule the meeting for the following week.

45. On or around August 29, 2018, Dr. Issa sought out Plaintiff and proceeded to become belligerent. Dr. Issa screamed at Plaintiff, demanding answers as to why the company "Hedis" score was only 99 points. Despite explaining that the "Hedis" number were never assigned as her responsibility in market, Dr. Issa continued to be irrational and out of control as he yelled at Plaintiff. Following this attack, Plaintiff became emotional and left the office crying.

46. On or around August 30, 2018, without notice, Defendant Company wrongfully and unlawfully terminated Plaintiff.  Defendant Company terminated Plaintiff because of her refusal to engage in a sexual relationship with Dr. Issa and in retaliation for her objection to Dr. Issa's unlawful behavior.

47. At all material times, Plaintiff claims a continuous practice of sexual harassment and hostile work environment.

48. The above are just some examples, of some of the discrimination and retaliation to which Defendant subjected Plaintiff.

49. The Defendant exhibited a pattern and practice of not only discrimination but also retaliation.

50. At all times material, Defendant's supervisors/management acted with deliberate indifference to the sexual harassment and hostile work environment; and retaliation thereof.

51. As a result of Defendants' continued harassment of Plaintiff, she suffered numerous injuries including physical, economic, and emotional damages.

52. As a result of Defendant's actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

53. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

54. As Defendants' conduct has been malicious, reckless, willful, outrageous, and conducted with full knowledge of the law, Plaintiff will demand punitive damages against Defendants.

## AS A FIRST CAUSE OF ACTION FOR
## <u>DISCRIMINATION UNDER TITLE VII</u>

55. Plaintiff realleges and adopts, as if fully set forth herein, the allegations stated in the above numerated paragraphs.

56. On a daily and consistent basis throughout the course of her employment, Plaintiff's supervisor made unwelcomed sexual advanced and comments to Plaintiff.

57. On or around March 23, 2018, Dr. Issa took Plaintiff to a corporate event at Eleven Nightclub. While at the event, Dr. Issa cornered Plaintiff and attempted to kiss Plaintiff. Without prompting and against the wishes of Plaintiff, Dr. Issa forcibly grabbed Plaintiff's face and refused to let go.

58. On a regular and frequent basis throughout the course of her employment, Dr. Issa informed Plaintiff that he was separated and that his divorce was proceeding.

59. After consistent "reminders" and feeling pressured, Plaintiff entered into a "romantic" relationship with Dr. Issa in or around the end of March 2018.

60. At all times material, Dr. Issa instructed Plaintiff that he did not want it to be known that they were "seeing each other" as it would have implications on his divorce.

61. On or around March 31, 2018, Dr. Issa asked Plaintiff to permanently take on the marketing responsibilities with PCP. Plaintiff agree and insisted that she needed additional training, to which Dr. Issa agreed.

62. At all times material, subsequent to agreeing to enter in a "relationship," Defendant Company increased Plaintiff's salary $10,000/month, as previously promised.

63. At all times material, Dr. Issa began providing Plaintiff with lavish and expensive gifts, including offering to pay for extensive repairs to Plaintiff's condominium.

64. On or around June 24, 2018, Dr. Issa asked Plaintiff to join him on vacation to Israel over July 4, 2018. Plaintiff reluctantly agreed.

65. At all material times, Dr. Issa took care of booking the trip, insisting that he would tell the staff that they both "happened" to have off at the same time. Dr. Issa was adamant that no other employee know that Plaintiff was joining him on his vacation.

66. During the trip in Israel, Plaintiff and Dr. Issa get into an argument. Upon the trip's end, Plaintiff informed Dr. Issa that she was not interested in continuing any personal relationship with Dr. Issa and insisted that their "romantic" relationship end immediately.

67. On July 24, 2018, Plaintiff reluctantly joined Dr. Issa for dinner on his birthday.  During dinner, Plaintiff and Dr. Issa spoke about his interest in acquiring dozens of existing medical practices.  Dr. Issa insisted that he would give Plaintiff a fee for helping negotiate the acquisitions of these new medical practices, promising that he would take care of Plaintiff and teach her how to negotiate.  Furthermore, Dr. Issa told Plaintiff that he would give her stock in the new company upon completion of the acquisitions, explaining that the mergers could result in a valuation of over $400 million.

68. After dinner, Dr. Issa again attempted to engage Plaintiff in a physical relationship, cornering her and trying to kiss her against her wishes. Plaintiff pleaded with Dr. Issa, exclaiming she was uninterested and shouting "NO," but he persisted.  Plaintiff repeatedly told him she just wanted to remain professional. Angered by her response, Dr. Issa hastily left Plaintiff alone in the car.

69. Title VII states in relevant parts as follows: § 2000e-2. *[Section 703]*(a) Employer practices It shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

70. Defendant engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by discriminating against and sexually harassing Plaintiff because of her gender/sex.

71. The sexually harassing and discriminatory conduct directed at Plaintiff was sufficiently severe and pervasive so as to unreasonably interfere with Plaintiff's physical and/or psychological health, work performance and to create and intimidating, hostile and offensive working environment.

72. As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of the Title VII, Plaintiff suffered and will continue to suffer damages including lost wages and benefits, severe emotional distress, mental anguish, suffering, loss of dignity, humiliation, embarrassment, loss of reputation, and other pecuniary and non-pecuniary losses.

73. Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

74. Conduct of Defendant and/or its agents deprived Plaintiff of her statutory rights guaranteed under federal law.

75. Plaintiff has been damaged by the illegal conduct of Defendant.

### AS A SECOND CAUSE OF ACTION FOR
### RETALIATION UNDER TITLE VII

76. Plaintiff realleges and adopts, as if fully set forth herein, the allegations stated in the above numerated paragraphs.

77. During the trip in Israel, Plaintiff and Dr. Issa get into an argument. Upon the trip's end, Plaintiff informed Dr. Issa that she was not interested in continuing any personal relationship with Dr. Issa and insisted that their "romantic" relationship end immediately.

78. Dr. Issa became incensed at Plaintiff ending their relationship and began to retaliate against Plaintiff at work.

79. On or around July 24, 2018, Plaintiff asked Dr. Issa for permission to use her vacation time from September 13, 2018 through September 19, 2018 to visit her aunt who going through treatment for Stage 4 Lung Cancer.  Dr. Issa reluctantly approved a portion of Plaintiff's request, demanding she be back by September 17, 2018 to attend a Humana Benefits dinner with him.

80. Dr. Issa began to ignore Plaintiff, instead choosing to actively make unreasonable demand on Plaintiff through her co-workers rather than contact her directly.

81. On or around August 2, 2018, Defendant's Chief Operations Officer, Audra Harding (hereinafter referred to as "Ms. Harding"), contacted Plaintiff to schedule a meeting for September 13, 2018, expressly at Dr. Issa's request.  Plaintiff told Ms. Harding that by Dr. Issa has approved her vacation and, as a result, she would not be able to make the meeting. Regardless, Ms. Harding preceded to reprimand Plaintiff.

82. On or around August 10, 2018, Ms. Harding again contact Plaintiff, angered and insisting that the Defendant's website was incorrect, demanding that Plaintiff make changes to the website. Plaintiff immediately addressed and revised the website per Ms. Harding's instructions.

83. Plaintiff had no alternative choice but to go through third parties to ensure she got answers and guidance in relation to her daily office tasks/assignments.

84. Prior to turning down Dr. Issa's propositions and advances, Defendant Issa assured Plaintiff that she could contact him regarding any questions she had relating to work.

85. On or around August 16, 2018, Plaintiff joined Dr. Issa and her colleagues for dinner. Following dinner, Dr. Issa called Plaintiff on her personal phone. Plaintiff let the call go to voicemail as she was already on the phone. Once her prior call ended, Plaintiff immediately called Dr. Issa back. Upon him answering, Dr. Issa demanded to know who she did not

answer, insisting he was angered by her not answering his call immediately. Dr. Issa berated Plaintiff, asserting he did not have time to teach her how to do open enrollment and that she should "figure it out on [her] own."

86. Stunned, Plaintiff asked Dr. Issa what changed, explaining that this was not their original agreement and that he knew she had no experience in this field and needed his guidance. As Plaintiff spoke, Dr. Issa unceremoniously and abruptly hung up the phone, ignoring Plaintiff.

87. On or around August 20, 2018, Dr. Issa sent Plaintiff a text message saying that there was an "error" with the company van.

88. On or around August 22, 2018, after Plaintiff researched the above issue, and determined a quick solution to the problem, Plaintiff contacted Dr. Issa and apprised him of the solution. When Plaintiff insisted, she would "handle" the matter immediately, Dr. Issa was appreciative and expressed no further concerns.

89. On or around August 28, 2018, Dr. Issa asked to meet Plaintiff the following day to discuss marketing strategy.  After some communication back and forth regarding date/time, Plaintiff and Dr. Issa agreed to meet that Friday, August 31, 2018.  Shortly thereafter, Dr. Issa once again changes his mind and proceeds to reschedule the meeting for the following week.

90. On or around August 29, 2018, Dr. Issa sought out Plaintiff and proceeded to become belligerent. Dr. Issa screamed at Plaintiff, demanding answers as to why the company "Hedis" score was only 99 points. Despite explaining that the "Hedis" number were never assigned as her responsibility in market, Dr. Issa continued to be irrational and out of control as he yelled at Plaintiff. Following this attack, Plaintiff became emotional and left the office crying.

91. On or around August 30, 2018, without notice, Defendant Company wrongfully and unlawfully terminated Plaintiff.  Defendant Company terminated Plaintiff because of her

refusal to engage in a sexual relationship with Dr. Issa and in retaliation for her objection to Dr. Issa's unlawful behavior.

92. At all times relevant, Plaintiff acted in good faith and with the objective and subjective belief that violations by Defendant's employees of Title VII had occurred.

93. At all times material, Defendant allowed the sexually harassing and discriminatory practices to continue in the work environment.

94. At all times relevant, the unlawful discrimination by Defendant's employees against Plaintiff in the terms and conditions of her employment because she opposed a practice made unlawful by Title VII which would not have occurred but for that opposition.

95. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. $2000e-3(a) provides that it shall be unlawful employment practice for an employer:

"(1) to … discriminate against any of his employees … because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

96. Defendants engaged in unlawful employment practice prohibited by 42 U.S.C. $2000e *et seq.* by retaliating against Plaintiff with respect to the terms, conditions or privileges of employment because of her opposition to the unlawful employment practices of Defendants.

97. At all times relevant, Defendant's employees acted intentionally and with reckless disregard of Plaintiff's rights protected by Title VII.

98. At all material times, the employer exhibiting discriminatory conduct against Plaintiff possessed the authority to affect the terms, conditions and privileges of Plaintiff's employment with the Defendant.

99. As a direct and proximate result of Defendant's intentional retaliatory conduct in violation of the Title VII, Plaintiff suffered and will continue to suffer damages including lost wages

and benefits, severe emotional distress, mental anguish, suffering, loss of dignity, humiliation, embarrassment, loss of reputation, and other pecuniary and non-pecuniary losses.

100.   Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

101.   Conduct of Defendant and/or its agents deprived Plaintiff of her statutory rights guaranteed under federal law.

102.   Plaintiff has been damaged by the illegal conduct of Defendant.

## AS A THIRD CAUSE OF ACTION FOR
## DISCRIMINATION UNDER STATE LAW

103.   Plaintiff realleges and adopts, as if fully set forth herein, the allegations stated in the above numerated paragraphs.

104.   On or around March 23, 2018, Dr. Issa took Plaintiff to a corporate event at Eleven Nightclub.  While at the event, Dr. Issa cornered Plaintiff and attempted to kiss Plaintiff. Without prompting and against the wishes of Plaintiff, Dr. Issa forcibly grabbed Plaintiff's face and refused to let go.

105.   On a regular and frequent basis throughout the course of her employment, Dr. Issa informed Plaintiff that he was separated and that his divorce was proceeding.

106.   After consistent "reminders" and feeling pressured, Plaintiff entered into a "romantic" relationship with Dr. Issa in or around the end of March 2018.

107.   At all times material, Dr. Issa instructed Plaintiff that he did not want it to be known that they were "seeing each other" as it would have implications on his divorce.

108.   On or around March 31, 2018, Dr. Issa asked Plaintiff to permanently take on the marketing responsibilities with PCP. Plaintiff agree and insisted that she needed additional training, to which Dr. Issa agreed.

109.   At all times material, subsequent to agreeing to enter in a  "relationship," Defendant Company increased Plaintiff's salary $10,000/month, as previously promised.

110.   At all times material, Dr. Issa began providing Plaintiff with lavish and expensive gifts, including offering to pay for extensive repairs to Plaintiff's condominium.

111.   On or around June 24, 2018, Dr. Issa asked Plaintiff to join him on vacation to Israel over July 4, 2018. Plaintiff reluctantly agreed.

112.   At all material times, Dr. Issa took care of booking the trip, insisting that he would tell the staff that they both "happened" to have off at the same time. Dr. Issa was adamant that no other employee know that Plaintiff was joining him on his vacation.

113.   During the trip in Israel, Plaintiff and Dr. Issa get into an argument. Upon the trip's end, Plaintiff informed Dr. Issa that she was not interested in continuing any personal relationship with Dr. Issa and insisted that their "romantic" relationship end immediately.

114.   On July 24, 2018, Plaintiff reluctantly joined Dr. Issa for dinner on his birthday.  During dinner, Plaintiff and Dr. Issa spoke about his interest in acquiring dozens of existing medical practices. Dr. Issa insisted that he would give Plaintiff a fee for helping negotiate the acquisitions of these new medical practices, promising that he would take care of Plaintiff and teach her how to negotiate.  Furthermore, Dr. Issa told Plaintiff that he would give her stock in the new company upon completion of the acquisitions, explaining that the mergers could result in a valuation of over $400 million.

115. After dinner, Dr. Issa again attempted to engage Plaintiff in a physical relationship, cornering her and trying to kiss her against her wishes. Plaintiff pleaded with Dr. Issa, exclaiming she was uninterested and shouting "NO," but he persisted. Plaintiff repeatedly told him she just wanted to remain professional. Angered by her response, Dr. Issa hastily left Plaintiff alone in the car.

116. As a result of her gender/sex, Defendant subjected and permitted it's employees to expose Plaintiff to discrimination and unlawful discharge.

117. The FCRA prohibits Defendant Company from discriminating against Plaintiff because of her gender/sex with regard to discharge, employee compensation, and other terms, conditions, and privileges of employment.

118. On a daily and consistent basis throughout the course of her employment, Plaintiff's supervisor made unwelcomed sexual advanced and comments to Plaintiff.

119. Defendant violated the FCRA by discriminating against Plaintiff and subjecting Plaintiff to an unlawful sexually harassing environment based her gender/sex, of which the Defendant was fully aware of.

120. The sexually harassing and discriminatory directed at Plaintiff was sufficiently severe and pervasive so as to unreasonably interfere with Plaintiff's physical and/or psychological health, work performance and to create and intimidating, hostile and offensive working environment.

121. As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of the FCRA, Plaintiff suffered and will continue to suffer damages including lost wages and benefits, severe emotional distress, mental anguish, suffering, loss of dignity, humiliation, embarrassment, loss of reputation, and other pecuniary and non-pecuniary losses.

122.   Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

123.   Conduct of Defendant and/or its agents deprived Plaintiff of his statutory rights guaranteed under state law.

124.   Plaintiff has been damaged by the illegal conduct of Defendant.

## AS A FOURTH CAUSE OF ACTION FOR
## RETALIATION UNDER STATE LAW

125.   Plaintiff realleges and adopts, as if fully set forth herein, the allegations stated in the above numerated paragraphs.

126.   During the trip in Israel, Plaintiff and Dr. Issa get into an argument. Upon the trip's end, Plaintiff informed Dr. Issa that she was not interested in continuing any personal relationship with Dr. Issa and insisted that their "romantic" relationship end immediately.

127.   Dr. Issa became incensed at Plaintiff ending their relationship and began to retaliate against Plaintiff at work.

128.   On or around July 24, 2018, Plaintiff asked Dr. Issa for permission to use her vacation time from September 13, 2018 through September 19, 2018 to visit her aunt who going through treatment for Stage 4 Lung Cancer.  Dr. Issa reluctantly approved a portion of Plaintiff's request, demanding she be back by September 17, 2018 to attend a Humana Benefits dinner with him.

129.   Dr. Issa began to ignore Plaintiff, instead choosing to actively make unreasonable demand on Plaintiff through her co-workers rather than contact her directly.

130.   On or around August 2, 2018, Defendant's Chief Operations Officer, Audra Harding (hereinafter referred to as "Ms. Harding"), contacted Plaintiff to schedule a meeting for

September 13, 2018, expressly at Dr. Issa's request.  Plaintiff told Ms. Harding that by Dr.
Issa has approved her vacation and, as a result, she would not be able to make the meeting.
Regardless, Ms. Harding preceded to reprimand Plaintiff.

131.   On or around August 10, 2018, Ms. Harding again contact Plaintiff, angered and insisting
that the Defendant's website was incorrect, demanding that Plaintiff make changes to the
website.   Plaintiff immediately addressed and revised the website per Ms. Harding's
instructions.

132.   Plaintiff had no alternative choice but to go through third parties to ensure she got answers
and guidance in relation to her daily office tasks/assignments.

133.   Prior to turning down Dr. Issa's propositions and advances, Defendant Issa assured
Plaintiff that she could contact him regarding any questions she had relating to work.

134.   On or around August 16, 2018, Plaintiff joined Dr. Issa and her colleagues for dinner.
Following dinner, Dr. Issa called Plaintiff on her personal phone. Plaintiff let the call go to
voicemail as she was already on the phone. Once her prior call ended, Plaintiff immediately
called Dr. Issa back. Upon him answering, Dr. Issa demanded to know who she did not
answer, insisting he was angered by her not answering his call immediately. Dr. Issa berated
Plaintiff, asserting he did not have time to teach her how to do open enrollment and that she
should "figure it out on [her] own."

135.   Stunned, Plaintiff asked Dr. Issa what changed, explaining that this was not their original
agreement and that he knew she had no experience in this field and needed his guidance. As
Plaintiff spoke, Dr. Issa unceremoniously and abruptly hung up the phone, ignoring Plaintiff.

136.   On or around August 20, 2018, Dr. Issa sent Plaintiff a text message saying that there was
an "error" with the company van.

137.   On or around August 22, 2018, after Plaintiff researched the above issue, and determined a quick solution to the problem, Plaintiff contacted Dr. Issa and apprised him of the solution. When Plaintiff insisted, she would "handle" the matter immediately, Dr. Issa was appreciative and expressed no further concerns.

138.   On or around August 28, 2018, Dr. Issa asked to meet Plaintiff the following day to discuss marketing strategy.  After some communication back and forth regarding date/time, Plaintiff and Dr. Issa agreed to meet that Friday, August 31, 2018.  Shortly thereafter, Dr. Issa once again changes his mind and proceeds to reschedule the meeting for the following week.

139.   On or around August 29, 2018, Dr. Issa sought out Plaintiff and proceeded to become belligerent. Dr. Issa screamed at Plaintiff, demanding answers as to why the company "Hedis" score was only 99 points. Despite explaining that the "Hedis" number were never assigned as her responsibility in market, Dr. Issa continued to be irrational and out of control as he yelled at Plaintiff. Following this attack, Plaintiff became emotional and left the office crying.

140.   On or around August 30, 2018, without notice, Defendant Company wrongfully and unlawfully terminated Plaintiff.  Defendant Company terminated Plaintiff because of her refusal to engage in a sexual relationship with Dr. Issa and in retaliation for her objection to Dr. Issa's unlawful behavior.

141.   At all times relevant, Plaintiff acted in good faith and with the objective and subjective belief that violations by Defendant's employees of FCRA had occurred.

142.   At all times material, Defendant allowed the sexually harassing and discriminatory practices to continue in the work environment.

143.   At all times relevant, the unlawful discrimination by Defendant's employees against Plaintiff in the terms and conditions of her employment because she opposed a practice made unlawful by FCRA which would not have occurred but for that opposition.

144.   Defendants engaged in unlawful employment practice prohibited by the FCRA by retaliating against Plaintiff with respect to the terms, conditions or privileges of employment because of her opposition to the unlawful employment practices of Defendants.

145.   At all times relevant, Defendant's employees acted intentionally and with reckless disregard of Plaintiff's rights protected by FCRA.

146.   At all material times, the employer exhibiting discriminatory conduct against Plaintiff possessed the authority to affect the terms, conditions and privileges of Plaintiff's employment with the Defendant.

147.   As a direct and proximate result of Defendant's intentional retaliatory conduct in violation of the FCRA, Plaintiff suffered and will continue to suffer damages including lost wages and benefits, severe emotional distress, mental anguish, suffering, loss of dignity, humiliation, embarrassment, loss of reputation, and other pecuniary and non-pecuniary losses.

148.   Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

149.   Conduct of Defendant and/or its agents deprived Plaintiff of her statutory rights guaranteed under federal law.

150.   Plaintiff has been damaged by the illegal conduct of Defendant.

## DEMAND FOR JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, including but not limited to all emotional distress and economic damages, punitive damages, liquidated damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Dated: Miami, Florida
       December 11, 2019

                                        Respectfully submitted,

                                        DEREK SMITH LAW GROUP, PLLC
                                        *Attorneys for Plaintiff*

                                        Caroline H. Miller, Esq.
                                        Caroline@dereksmithlaw.com
                                        701 Brickell Avenue, Suite 1310
                                        Miami, FL 33131
                                        Tel: (305) 946-1884
                                        Fax: (305) 503-6741